UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEITH C. TOLBERT, : | |
|     Plaintiff, : | |
| : | |
| v. : | No. 2:22-cv-1182 |
| : | |
| CORRECTIONAL OFFICER BALDWIN, : | |
|     Defendant. : | |

**O P I N I O N**
Plaintiff's Motion in Limine, ECF No. 218 – Granted

**Joseph F. Leeson, Jr.**      May 9, 2025
**United States District Judge**

## I.   INTRODUCTION

Plaintiff Keith C. Tolbert, an inmate, alleges that he informed Defendant Baldwin, a corrections officer, that he was threatened by another inmate and that Baldwin failed to protect him from the subsequent assault by two inmates. Video footage of the assault itself was preserved, but video footage of the time Tolbert was allegedly threatened and of the time he allegedly reported the threats to Baldwin was not preserved. For the reasons set forth below, the selective failure to preserve video footage was spoliation of evidence and an adverse jury instruction will be given.

## II.   BACKGROUND

### A.   Factual Background[1]

On March 20, 2020, Tolbert was an inmate at the State Correctional Institution at Phoenix ("SCI Phoenix"). Tolbert alleges that shortly before 19:55[2] this date, he was threatened by another inmate while using the telephone on JA-Block. When Tolbert finished his phone call, he allegedly informed Baldwin, who was standing at the officer's desk next to the telephones, that he had been threatened. Tolbert contends he asked Baldwin to open his cell door so he could lock-in. On the way to his cell, Tolbert was stopped by inmate Burley, who was now[3] wearing black gloves, which Tolbert asserts was evidence of Burley's intent to cause serious harm. Burley initially blocked Tolbert from entering his cell, then snuck inside. Tolbert, who did not see Burley inside, entered his cell where Burley started assaulting Tolbert.

Baldwin arrived at Tolbert's cell and ordered the inmates to come out. Tolbert ran out. Burley followed, chasing Tolbert through the dayroom and assaulting him. Inmate Clancy joined in the chase and assault of Tolbert. Burley and Clancy punched and kicked Tolbert dozens of times in the head, face, ribs, back, and body. Baldwin followed them and, at one point, deployed his oleoresin capsicum spray. The assault of Tolbert lasted several minutes. During this time, Burley also assaulted Baldwin and Clancy assaulted another corrections officer who had entered the dayroom.

Tolbert has stated an Eighth Amendment claim against Baldwin for failure to protect to him, which is scheduled for trial on May 12, 2025.

---

[1]   *See* SJ Opn., ECF No. 149 (providing a detailed statement of facts with citations to the record)

[2]   Because the video footage is in military time, this Court refers to military time throughout for consistency.

[3]   Burley was not wearing gloves when he first threatened Tolbert.

B.     **Procedural Background**

On March 26, 2020, Tolbert filed a grievance alleging that SCI Phoenix did not have an effective policy or protocol to ensure his safety and that staff members "did not act quickly enough to stop assault or prevent it." *See* Hrg Ex. D-2; *See also* Ex. A1, ECF No. 7. The grievance stated that Tolbert would "be seeking monetary compensation for punitive and compensatory damages, in the form of $2.5 million U.S. dollars." *Id.* There is no mention of video or request for preservation in the grievance. *See id.*

Tolbert initiated the above-captioned action on or about March 24, 2022,[4] against eight (8) defendants. After dismissal of numerous defendants and claims, including the Pennsylvania Department of Corrections ("DOC"),[5] the matter proceeded to discovery against the remaining two defendants based on Tolbert's claims against Baldwin for Eighth Amendment failure to protect and against Morgan for First Amendment retaliation.[6] Throughout the period of discovery, Tolbert repeatedly requested production of the "full" video from 19:00 to 20:45. *See, e.g.* ECF Nos. 80, 85. This Court addressed eight (8) Motions to Compel and three (3) Motions for Sanctions[7] filed by Tolbert. There is one claim remaining against Baldwin for failure to protect, which is scheduled for trial on May 12, 2025.

---

[4]     The Complaint is dated March 16, 2022, which under the prison mailbox rule is the operative date of filing.

[5]     In an Opinion dated April 4, 2022, this Court dismissed the DOC based on Eleventh Amendment immunity. *See* Screening Opn. 5, ECF No. 5.

[6]     Lieutenant Morgan issued Tolbert a misconduct for fighting two days after the incident. Tolbert did not know or speak with Morgan before he filed the charge. After the first misconduct charge was dismissed, Morgan filed another misconduct against Tolbert for fighting. This charge was also subsequently dismissed, with prejudice.

[7]     On August 13, 2024, this Court, finding that Defendants had repeatedly failed to timely respond to discovery requests and/or provided incomplete discovery, granted sanctions against Defendants, *see* ECF Nos. 149-150. *See Neal v. Powell*, No. 17-4768, 2024 U.S. Dist. LEXIS

Also pending is Plaintiff's Motion in Limine seeking an adverse inference jury instruction due to spoliation of video evidence. *See* ECF No. 218. *See also* Opp., ECF No. 222. In an Order dated April 17, 2025, this Court granted the Motion in part and scheduled an evidentiary hearing to address, *inter alia*, whether the spoliation was in bad faith. *See* Limine Order, ECF No. 223.

### C. Video Evidence

Throughout the period of discovery, Tolbert repeatedly requested production of the "full" video from 19:00 to 20:45. *See, e.g.* ECF Nos. 80, 85. Video of the assault was produced during discovery and admitted to the Court as an exhibit to the summary judgment motion. *See* ECF No. 120-2. The video footage produced is from six different camera angles. There are two camera angles showing the telephones and officers' desk, while the remaining four angles show the dayroom. There are two videos from five of the angles, and one video from the sixth angle. Video from the five angles each runs from 19:55 to 20:25. The second video from the five angles, as well as the one video from a sixth angle, each runs from 20:25:00 to 20:25:31.

The video begins at 17:55 when Tolbert was standing just outside his cell, along with Baldwin. A second later, Burley exited Tolbert's cell and began punching Tolbert. Twenty-five seconds into the video, Clancy joined in the assault. At 19:55:34, while Tolbert is on the ground being punched by both inmates, Baldwin and Sergeant Eskew deployed their oleoresin capsicum spray. Burley punched Sergeant Eskew, knocking her unconscious. Burley then punched Baldwin repeatedly. During this time, Tolbert got up from the floor and started walking away, but Clancy charged at him from behind and knocked him to the floor. Clancy continued to

---

127589, at *21 (D.N.J. July 19, 2024) (concluding that "misrepresentations and other misconduct by a party's attorney can be a factor in determining whether the party acted in bad faith" for spoliation).

punch Tolbert, who was on the floor, until 19:56:08, when Clancy walked away. At 19:57:08, additional officers entered the cell block and began securing inmates. All inmates, including those returning from the shower, were locked in their cells by 20:02:17. Sergeant Eskew, who had been knocked unconscious when punched by Burley, laid on the floor until escorted off by EMTs at 20:24. The video stopped less than one minute later.

### D.    Hearing Testimony- Video Preservation

Tolbert testified that on March 22, 2020, two days after the assault,[8] he met with Darryl Bradley, Deputy Superintendent Internal Security, and orally requested that he preserve video footage from 19:00 to 20:55, to which Bradley responded that he would. Tolbert testified that he informed Bradley the video was for future litigation purposes. Tolbert testified that the next day, he made a written request for preservation of the video to the Superintendent's Assistant, Gena Orlando, but never received a response. Tolbert testified that when making the requests for video preservation, he gave the various DOC officials the time frame requested and details about what he wanted the video to show, including the threats by the other inmates and his report to Baldwin. Tolbert had a good recollection of the events, and his testimony was consistent throughout. This testimony was not challenged on cross examination.

Major David Mascellino testified that SCI-Phoenix's video system, which records 24/7, retains video for thirty days then it is overwritten unless preserved in order to free up space. On March 20, 2020, Mascellino was a Security Captain at SCI Phoenix and was responsible for preserving video of the force used for the Extraordinary Occurrence Report ("EOR"). However,

---

[8] For purposes of this Opinion, this Court refers to "the assault" to include not only Tolbert's assault by Burley and Clancy, but also to the events leading up to the assault that form the basis of Tolbert's failure to protect claim, including the alleged threats and report to Baldwin. The assault is distinguishable from "the incident" that Major David Mascellino testified about, which he limited to the injuries to the corrections officers and officers' use of force.

he gave inconsistent testimony as to whether he solely made the decision as to what portions of the video footage to preserve or whether Captain Walter Grunder decided when to start and stop the video. Mascellino testified that Baldwin did not have access to the video or the authority to retain video, but Baldwin could request that video be preserved. Mascellino was not on shift at the time of the assault, but was called back in because two corrections officers were assaulted. He testified that "all" inmates were interviewed as part of the security investigation but that he did not conduct the interviews. Rather, Lieutenants Morgan and Mason conducted the interviews. Mascellino, who did not review the Lieutenants' interview reports, testified that he knew the interviews were completed because it was "standard procedure."[9] Mascellino testified that said reports were in the Security Office; however, according to counsel for Defendant in response to an Order to show cause explaining why none of the inmate interviews were provided to Tolbert during discovery, interviews with the inmates "were informal and nothing was written down or recorded." *See* Resp. Show Cause ¶ 6, ECF No. 235. Mascellino never spoke to or saw Tolbert after the incident. Mascellino testified that he never saw, nor preserved, the video footage showing the phones prior to the assault because it was "not important." However, in his Security Report to Darryl Bradley, Deputy Superintendent Internal Security, he stated that the assault reportedly began because Tolbert "bogarted the phone" from Burley and challenged him to a fight. *See* Hrg Ex. P-1. Mascellino testified that "bogart" the phone means that the inmate(s) would not let another inmate use the phone and, instead, would hand the phone to

---

[9] The interview procedure is governed by DOC policy. *See* DC-ADM 001 (providing that when an allegation of abuse, which includes the "use of excessive force upon an inmate" and the "improper use of force upon an inmate," is made, the "Security Office/BCC shall . . . interview all inmate witnesses and obtain an Inmate Written Statement from the inmate(s) following the interview"). However, failing to obtain written statements violated DOC policy. *See id.*

someone else.  Mascellino testified that he was unaware of any request to preserve additional video.  He never spoke with Bradley.

**III.   LEGAL STANDARD - Spoliation**

Spoliation occurs not only where "evidence is destroyed or altered" but also "when a party fails to preserve evidence in instances where litigation is pending or reasonably foreseeable." *See United States v. Nelson*, 481 F. App'x 40, 42 (3d Cir. 2012) (citations omitted).  The Third Circuit established a four-part test to determine whether spoliation occurred. "Spoliation occurs where: [1] the evidence was in the party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and [4] the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. UPS*, 665 F.3d 68, 73 (3d Cir. 2012).  "As to the third element concerning suppression or withholding of evidence, 'a finding of bad faith'—which may be inferred from circumstantial evidence—is 'pivotal' to determining whether 'sanctionable spoliation' has occurred." *Cascella v. United States*, No. 4:21-CV-01490, 2023 U.S. Dist. LEXIS 44731, *1-3 (M.D. Pa. Mar. 16, 2023) (quoting *Bull*, 665 F.3d at 79)  A party seeking spoliation sanctions must establish the requisite elements by a preponderance of the evidence.  *See Hoffer v. Tellone*, 128 F.4th 433, 440 (2d Cir. 2025).

"If spoliation is found, the court may impose sanctions against the offending party. These sanctions can include: (1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; and (5) attorneys' fees and costs." *Green v. Burkhart*, No. 14-159ERIE, 2015 U.S. Dist. LEXIS 202431, *2-3 (W.D. Pa. Aug. 11, 2015) (internal quotations omitted). The court "only upon finding that the party acted with the intent to deprive another party of the

information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2). "[T]he sanctions analysis includes the following factors: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Bull*, 665 F.3d at 73 (quotations omitted).

IV.   **ANALYSIS**

   A.   **Spoliation- Baldwin had control.**

Control has been defined as "the legal right or ability to obtain the documents from another source upon demand." *See Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d Cir. 2004). "[C]ourts have found that control may exist even if a third party physically possesses the evidence at issue." *See First Senior Fin. Grp. LLC v. Watchdog*, No. 12-cv-1247, 2014 U.S. Dist. LEXIS 45952, at *13 (E.D. Pa. Apr. 3, 2014) (citing cases).

Mascellino testified that Baldwin had the ability to request that the video footage be preserved.[10] Moreover, when Tolbert sought the video footage during discovery, Baldwin, through his counsel, the Pennsylvania Attorney General's Office, had the ability to obtain the video. *See Neal v. Powell*, No. 17-4768, 2024 U.S. Dist. LEXIS 127589, *11-16 (D.N.J. July 19, 2024) (concluding that the corrections officers had "control" over prison medical records for

---

[10]   The fact that Baldwin is no longer an employee of the DOC is irrelevant because he could have preserved the video within the first thirty days after the assault, during which time he was an employee. Also, despite his departure from the DOC, the Pennsylvania Attorney General's Office continues to represent him in the instant litigation.

purposes of spoliation based on their ability to produce a copy in discovery); *Love v. N.J. Dep't of Corr.*, No. 2:15-CV-4404-SDW-SCM, 2017 U.S. Dist. LEXIS 128905, *13-14 (D.N.J. Aug. 11, 2017) (determining that the corrections officers had control over prison records through their attorney- the state Attorney General). The fact that the video had been overwritten pursuant to DOC policy by the time of the discovery request does not negate control. *See Prall v. Bocchini*, No. 10-1228-JBS-KMW, 2015 U.S. Dist. LEXIS 198026, at *4-5 (D.N.J. Mar. 3, 2015) (finding that the individual DOC defendants, who were attempting to comply with the plaintiff's discovery request when they learned that the video had been overwritten due to the prison's retention policy, had control over the video footage). Thus, for spoliation purposes, Baldwin had control of the video footage.

      **B.**      **Spoliation- The video is relevant.**

There is no real dispute that video footage showing Tolbert on the phone at the time of the alleged threats by another inmate and, also, showing Tolbert speaking with Baldwin would be relevant to the case. This element of spoliation is satisfied.

      **C.**      **Spoliation- The DOC, and by extension Baldwin, had a duty to preserve the video.**

"[C]ourts in this district have, under certain circumstances, concluded that the duty to preserve evidence can be imputed to individual corrections officers, even if the allegedly spoliated evidence was formally in the custody of the facility." *Neal*, 2024 U.S. Dist. LEXIS 127589, *14-15 (imputing the DOC's duty to preserve evidence onto the individual corrections officers because even though sued their individual capacities, the officers were being represented by the state Attorney General's Office and would be indemnified by the state in the litigation). A "rule to the contrary 'would lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in

prisoner suits,' as the DOC cannot be sued for damages under Section 1983, nor can it be held vicariously liable for the torts of its employees." *See id.* at *14-15 (citations omitted).

This "absurd result" is evident here as Tolbert named the DOC as a defendant in the above-captioned action, but the DOC was dismissed on immunity grounds. Tolbert's grievance, alleging that "SCI Phoenix did not provide staff members effective policy or protocol to ensure my safety. . . . ", also included allegations against the DOC. Accordingly, the DOC's duty to preserve video evidence is imputed to Baldwin.

Tolbert's grievance stated his intent to seek monetary compensation for the injuries he suffered, which is not available through the prison grievance system,[11] and therefore put the DOC on notice that litigation was reasonably foreseeable. *See Bistrian v. Levi*, 448 F. Supp. 3d 454, 469 (E.D. Pa. 2020) ("[C]ourts have held that in the correctional context, a duty to preserve may attach when an inmate is in a fight or when an inmate files grievances about [such an] incident." (internal quotations omitted)). Tolbert's complaints in the grievance that DOC staff members "did not act quickly enough to stop assault *or prevent it*," put the DOC on notice that video footage before the assault began was relevant to said litigation. Furthermore, Mascellino, who conducted the security investigation and knew that the cause of the fight reportedly arose when Tolbert spoke with Burley at the telephones, *see* Hrg Ex. P-1, reviewed and denied Tolbert's grievance less than thirty days after the assault. Mascellino and the DOC therefore had notice that video footage of the telephones and of any inmates (Burley or Clancy) talking to Tolbert near the telephones, as well as footage of Tolbert going to his cell, which would have included Tolbert's conversation with Baldwin at the officers' desk, was relevant to Tolbert's

---

[11]    Exhaustion of the prison's grievance system is required before a civil action can be filed in federal court even though the prison's grievance system cannot provide money damages. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001).

claims and should have been preserved.[12] *See Peronace v. City of Phila.*, No. 23-3943-KSM, 2024 U.S. Dist. LEXIS 69727, at *14 (E.D. Pa. Apr. 16, 2024) (finding that although the preservation request pertained to video footage of an assault inside the plaintiff's cell, a "reasonable prison employee receiving such a request would recognize that footage of individuals *entering [the plaintiff's] cell* during the relevant time period falls within the scope of [the] request, even if there was no footage from the inside of the cell").

Additionally, Tolbert credibly[13] testified at the evidentiary hearing that he spoke with Bradley[14] on March 22, 2020, two days after the assault. Tolbert testified that he gave details to Bradley about being threatened while using the phone and about reporting the threats to Baldwin. Tolbert testified that he requested that Bradley preserve video footage between 19:00 and 10:55

---

[12] Defendant's counsel makes much about the failure of Tolbert to specifically request video preservation in his grievance. However, there is no DOC policy requiring an inmate to request evidence preservation in a grievance or even a policy explaining to an inmate how to request that evidence be preserved.

[13] This credibility finding is made after viewing Tolbert's demeanor on the stand. Tolbert had a good recollection of the events, and his testimony was consistent throughout. His testimony was not challenged on cross examination, nor was any evidence contradicting his testimony presented to the Court. Further, Tolbert's testimony that he requested footage beginning at 19:00 is consistent with his requests and with his testimony throughout the course of this case as to time of the threats. *See, e.g.* Compl., ECF No. 1 (Complaint dated March 16, 2022, alleging that Tolbert was threatened at approximately 19:00 by Burley and Clancy); Mtn, ECF No. 80 (Motion to Compel dated March 24, 2023, requesting video starting at 7:00 P.M.); Tolbert Dep. 8:24-9:9, ECF No. 120-3 (testifying that he was on the phones around 7:00 P.M. when threatened).

[14] At the time of this conversation, Bradley had received Mascellino's Security Report and, as the Deputy Superintendent Internal Security, he had the ability to preserve video footage.

for future litigation purposes.[15]  Tolbert testified that Bradley responded that he would preserve the video.[16]

Consequently, this Court finds that the DOC had a duty to preserve video footage beginning at 19:00 and that its duty is properly imputed to Baldwin.

   **D.    Spoliation- Bad faith.**

In determining bad faith, courts look to circumstantial evidence to determine intent, which may include "the timing of the destruction, whether there was selective preservation, and what preservation policies the party had in place."  *See Donofrio v. IKEA US Retail, LLC*, No. 19-1286, 2024 U.S. Dist. LEXIS 81853, *69 (E.D. Pa. May 6, 2024) (citations omitted)). "Common sense suggests that when a party preserves helpful or neutral information while deleting harmful information, that tends to indicate intentionality."  *Bistrian*, 448 F. Supp. 3d at 476.

Major Mascellino selectively preserved video footage of not only the assault in the dayroom and the officers' use of force, but also more than twenty minutes[17] of video after the assault had ended and all inmates were secured in their cells.  This additional preserved video footage showed only Sergeant Eskew lying on the floor unconscious (after having been earlier

---

[15]    Tolbert's testimony that he requested footage beginning at 19:00 is consistent with his requests and with his testimony throughout the course of this case as to time of the threats.  *See, e.g.* Compl., ECF No. 1 (Complaint dated March 16, 2022, alleging that Tolbert was threatened at approximately 19:00 by Burley and Clancy); Mtn, ECF No. 80 (Motion to Compel dated March 24, 2023, requesting video starting at 7:00 P.M.); Tolbert Dep. 8:24-9:9, ECF No. 120-3 (testifying that he was on the phones around 7:00 P.M. when threatened).
[16]    Tolbert also testified that he sent a written request for video preservation to the Superintendent's Assistant Gena Orlando, but that he never received a response.  Notably, Gena Orlando approved the denial of Tolbert's grievance on April 14, 2020, *see* Hrg Ex. D-2, and therefore had knowledge of his complaints and intent to pursue litigation.
[17]    The inmates' assault on Tolbert ended at 19:56:08.  All inmates on the block were locked in their cells by 20:02:17.  Sergeant Eskew was escorted off by EMTs at 20:24.  The video stopped less than one minute later.

punched by Burley), being tended to, and eventually being escorted off by EMTs. The extra video footage was not pertinent to the use-of-force investigation, and it advanced only the interests of the DOC. Major Mascellino's decision to preserve this additional footage after the assault contradicts his testimony that video showing what led to the inmate-on-inmate assault was "not important." His testimony that he did not think the earlier video footage was important is also in conflict with his decision to add details about the reported cause of the fight (Tolbert "bogarted the phone" from Burley and challenged him to a fight) to his one-paragraph Security Report. *See* Hrg Ex. P-1. Moreover, even if Major Mascellino did not think the earlier video should be preserved at the time, or as part, of his security investigation, his failure to preserve the earlier video after he reviewed Tolbert's grievance just a few weeks later, is evidence of his intent to deprive Tolbert of evidence.

There is also no explanation for Bradley's failure to preserve video footage beginning at 19:00, as he told Tolbert he would for Tolbert's use in future litigation. *Accord Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) (holding that no unfavorable inference arises "where the failure to produce it is otherwise properly accounted for"). *See also Peronace*, 2024 U.S. Dist. LEXIS 69727, at *19-21 (agreeing to instruct the jury that they may presume that the lost video footage was unfavorable to the defendant where the defendant selectively preserved certain prison video and "intentionally allowed the relevant hallway footage to be overwritten").

The DOC's failure to preserve video was intentional and in bad faith.

E. **Spoliation- Sanctions**

Having found spoliation, sanctions are warranted for the following reasons. First, the DOC is at fault for not preserving the video footage. Although Tolbert could have included a

13
050825

preservation request in his grievance, there is no DOC policy requiring him to do so or even a policy explaining to an inmate how to request that evidence be preserved. Moreover, Tolbert asked Bradley to preserve video, which also explains why he did not include a preservation request in his grievance. Second, Tolbert is highly prejudiced by the absence of the video because it would not only support his testimony that he was threatened at the telephones and reported the threats to Officer Baldwin, but it would also contradict Officer Baldwin's defense that he was never told about the threats. Even though the video does not include sound, seeing the parties' actions would be helpful, as would seeing whether there was any other reason for Officer Baldwin to go to Mr. Tolbert's cell. Third, there is no lesser sanction than an adverse inference instruction that would be reasonable here. The request for an adverse instruction is therefore granted.

## V.   CONCLUSION

For the reasons set forth herein, there was spoliation of video footage and an adverse inference instruction informing the jury that they may presume that the lost video footage was unfavorable to Baldwin will be given.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge