UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| KEITH C. TOLBERT, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 2:22-cv-1182 |
| | : | |
| CORRECTIONAL OFFICER BALDWIN, | : | |
| Defendant. | : | |

_____

**O P I N I O N**
**Plaintiff's Motion for a New Trial, ECF No. 276 - Denied**

**Joseph F. Leeson, Jr.**                                    **September 26, 2025**
**United States District Judge**

## I.    INTRODUCTION

Plaintiff Keith Tolbert, while incarcerated at the State Correctional Institution at Phoenix ("SCI Phoenix"), was assaulted by two other inmates. These inmates allegedly threatened Tolbert shortly before the assault, which Tolbert allegedly reported to a corrections officer, Defendant Randy Baldwin. Baldwin denied knowing about the threats. Tolbert's Eighth Amendment failure-to-protect claim against Baldwin proceeded to a jury trial. The jury returned a verdict in favor of Baldwin. Tolbert, who was represented by counsel at trial but is now acting pro se, has filed a Motion for New Trial. For the reasons set forth below, the Motion is denied.

## II.    BACKGROUND

### A.    Factual Background[1]

At trial, the jury heard testimony and saw evidence that on March 20, 2020, Tolbert was an inmate at SCI Phoenix housed on JA block. JA block is basically[2] a long rectangular shaped room with two levels of cells along the long sides. Tolbert's cell was on the first floor at the far end on the right side.[3] At the opposite end,[4] there were approximately eight to ten (8-10) telephones on the wall. Several feet out from the wall of phones sat an officers' desk. At 7:00 P.M., the inmates on JA block had recreation time, during which the inmates were allowed to walk around and use the telephones. At this time, the individual cell doors were unlocked. The doors could be unlocked from a control pad at the officers' desk. The doors would lock when closed shut.

Shortly before 8:00 P.M.,[5] Tolbert was using one of the telephones. Tolbert testified that while on the phone, he was threatened by inmate Burley. Burley was seen saying something to Tolbert by Rubar Crawford, an inmate who testified at trial that he could tell from body language that Burley was upset- he "looked off."[6] Inmate Dominique Lewis, however, who was using a telephone several phones down from Tolbert at the time of the events, testified that he did not

---

[1]    To the extent any of the facts discussed herein were disputed at trial, this Court has indicated the source of the evidence and any contradictory testimony.

[2]    This description is based on video footage of JA block shown to the jury and relates only to the areas relevant to this case. It is not intended to be an exact description of JA block.

[3]    The terms "far" and "right side" are based on the cell's orientation to the camera capturing the video admitted into evidence.

[4]    "Opposite" from Tolbert's cell, and close to the camera's location.

[5]    This time is based on Tolbert's testimony and the time from the video surveillance that was admitted into evidence. Baldwin's testimony was also consistent with this time. Tolbert's complaint regarding the timestamp on the video is discussed in a separate section below.

[6]    Crawford testified that he had recently been on the telephone and was standing outside his cell at the time of the events. He identified himself on the video shown to the jury.

hear anything happening near Tolbert to think Tolbert might be in danger.  Neither he, nor

Crawford heard the threat from Burley.[7]  After getting off the phone, Tolbert spoke with

Baldwin

at the officers' desk.[8]

Tolbert testified that he told Baldwin he had just been threatened and that he asked

Baldwin to unlock his cell so he could lock in.  Neither of Tolbert's witnesses, Lewis and

Crawford, heard what was said between Tolbert and Baldwin.  However, Lewis testified that

Tolbert was pointing at his cell, that he knew Tolbert was trying to get to his cell, and that there

seemed to be tension by both Tolbert and Baldwin.

Baldwin, who had been employed at SCI-Phoenix since May 2017, denied that there was

any tension or that any hands were raised during his conversation with Tolbert.  He testified that

he had recently completed security rounds[9] and was logging in his report when Tolbert

approached him.[10]  He testified that because he had been making his security rounds, which

included the bottom and top tiers of cells, he did not see or hear the interaction between Tolbert

and Burley at the phones.[11]  Baldwin denied that Tolbert told him about the threats.  He also

denied that Tolbert told him that he wanted to lock in.  Rather, according to Baldwin, Tolbert

---

[7]      There was no dispute that Tolbert was threatened.
[8]      At the time of the events, Baldwin was the only corrections officer on JA block, in
control of 132 inmates.
[9]      As part of his rounds, Baldwin would close cell doors, which would lock the cells.
[10]     Baldwin also testified that he was returning from rounds and arrived at the officers' desk
at the same time as Tolbert.
[11]     On cross examination, Baldwin acknowledged that his DC-121 report, Trial Ex. 6, states
that he was conducting security rounds when he heard an argument at the phones.  He attested
that his report was accurate and was prepared approximately four to five hours after incident.
Baldwin explained the discrepancy in his report (that he heard the argument), with his trial
testimony (that he did not hear the argument), by stating that other people reported there had
been an argument at the phones.  At the time of trial, Baldwin testified that he did not recall
seeing Tolbert, Burley, or Clancy at the phones that evening.

simply asked him to unlock Tolbert's cell.  He testified that Tolbert did not seem agitated or

scared, nor did he express any concern for his safety.[12]  Baldwin unlocked Tolbert's cell from the

officers' desk while logging in his rounds.

Baldwin remained at the officers' desk when Tolbert left and walked back to his cell.[13]

Baldwin testified that when he finished logging in the security report, he looked up.  He testified

that he looked at the phones first, then it got very quiet, he saw inmates racing to door, and he

heard thumping sounds so he knew something going on.  Baldwin got up and walked back

toward Tolbert's cell when he was stopped by inmate Clancy.  Clancy told him to stop and that it

"has to happen," to which Baldwin replied no, I can't.

Baldwin testified that when he got to Tolbert's cell, Tolbert and Burley were "squaring

up" inside.[14]  He testified that he tried to call it in to main control, but his radio was dead.[15]  He

opened the door and Tolbert exited first, then Burley, swinging.  Burley and Clancy followed

Tolbert throughout the dayroom, punching him.  Baldwin testified that he told them to stop, but

they did not, and he was getting his OC spray.[16]  Baldwin testified that Burley threatened him

---

[12]     Baldwin testified that as a matter of practice, if he knew an inmate was in danger, he
would have escorted the inmate to his cell and/or called main control to have the inmate taken
into protective custody.  He also testified that if Tolbert had said he was in danger on the day of
the events, he would have called main control.

[13]     Crawford testified that he saw the discussion at the officers' desk between Baldwin and
Tolbert, saw Tolbert go to his cell, and saw Baldwin arrive at Tolbert's cell.  He testified that
Tolbert had been there "maybe a couple of minutes" and that it "couldn't be that long" before
Baldwin arrived.

[14]     Crawford testified that before Tolbert got to his cell, he saw Burley go into Tolbert's cell.
There was no evidence that either Tolbert or Baldwin saw Burley enter Tolbert's cell.

[15]     Baldwin testified that around 7:00-7:30 P.M., he heard a sound from his radio that the
battery was going dead, so he asked the sergeant for a new battery.  No one had brought him a
new battery before the events, and he could not leave to block.

[16]     Baldwin is 5'2"; Burley is approximately 6'2" or 6'3"; Clancy is approximately 6'3" or
6'4"; Tolbert is not quite as tall as Clancy.

not to spray him and that another inmate was trying to stop Baldwin.[17]  He testified that he still

tried to get in between them.  Tolbert was knocked to the ground where Burley and Clancy

kicked him repeatedly.  Sergeant Eskew, who had just entered the block, was knocked out cold

when she tried to intervene.  When Baldwin used his OC spray, Burley punched Baldwin

repeatedly to the ground.  Baldwin testified that he got up and ran to the phone to call main

control, who advised that a response team was coming.  He testified that he did not know Tolbert

was still being assaulted until he saw the video surveillance sometime later.

The jury also heard the parties' stipulations about Tolbert's subsequent medical treatment

and injuries.  *See* Trial Exs. 11-13.  The parties stipulated, *inter alia*, that Tolbert was admitted to

the infirmary at SCI-Phoenix on March 20, 2020, at approximately 9:13 P.M. with complaints of

pain in his in face, neck, and arm.  He also had right facial numbness, abrasions to his eye and

lip, and redness from OC spray.  Photographs of Tolbert's injuries were shown to the jury.

### B.    Procedural Background

Tolbert initiated the above-captioned action pro se on or about March 24, 2022,[18] against

eight (8) defendants.  After dismissal of numerous defendants and claims, the matter proceeded

to discovery against two defendants.  Both defendants filed a Motion for Summary Judgment.

Summary judgment was granted in part and denied in part as to the Eighth Amendment failure-

to-protect claim against Baldwin.  *See* ECF No. 150 (Order dated August 13, 2024).  This claim

was scheduled for trial on May 12, 2025.

---

[17]    Inmate Crawford testified that other inmates also told Baldwin not to spray Burley.
[18]    The Complaint is dated March 16, 2022, which under the prison mailbox rule is the
operative date of filing.

Less than a month before the trial date, Laurie Jubelirer, Esquire entered an appearance on behalf on Tolbert.[19]  Tolbert's pro se filed pre-trial motions were dismissed without prejudice. Trial was rescheduled at Attorney Jubelirer's request for May 12, 2025.  *See* ECF Nos. 201, 204. On April 7, 2025, Attorney Jubelirer filed a Motion in Limine seeking an adverse inference jury instruction due to spoliation of video evidence.  *See* ECF Nos. 218, 222.  This Court granted the Motion in part and scheduled an evidentiary hearing to address, *inter alia*, whether the spoliation was in bad faith.  *See* Limine Order, ECF No. 223.  This hearing was held the same day as the final pre-trial conference.  On May 9, 2025, this Court granted the Motion in Limine, agreed to give the jury an adverse inference instruction regarding spoliation of video evidence, and directed counsel to submit a proposed adverse inference jury instruction by 9:00 A.M. on May 12, 2025.  *See* ECF No. 241-242.

On May 12, 2025, the jury was selected.  The eight (8) member jury was chosen from a panel of thirty (30) persons.  This Court conducted the voir dire, using the parties' proposed questions, of the jury panel as a group.  Follow-up questions were posed of five (5) panelists at side bar.  At side bar, panelist number four (4), who answered affirmatively during voir dire to the question: "Have you, a relative, or close friend ever been assaulted?", stated that she had been the victim of sexual assault.  When asked whether she could be fair and impartial in Tolbert's case, she responded that it was "hard to say."  Counsel[20] moved to strike panelist #4 for cause, there was no objection, and the Court granted the request.  Counsel for Tolbert and

---

[19]    Two weeks before Attorney Jubelirer entered her appearance, an attorney from the Eastern District's Prisoner Civil Rights Panel entered an appearance on behalf of Tolbert, who had been acting pro se.  This first attorney was allowed to withdraw when Attorney Jubelirer entered her appearance.  Co-counsel from Jubelirer Law, Nicole Newton, Esquire, subsequently entered her appearance on behalf of Tolbert.

[20]    Tolbert contends that Baldwin's counsel moved to strike panelist #4, but this Court recalls that the motion originated by Tolbert's counsel.  This Opinion discusses both scenarios.

Baldwin thereafter exercised three peremptory challenges each from the remaining top fifteen (15) panelists.

Trial began later that day. During the trial, the jury heard testimony from Tolbert, his two witnesses,[21] and Baldwin. The jury also saw, *inter alia*, video evidence of the incident and photographs of Tolbert's injuries. At the close of the evidence, before closing arguments, the Court gave the following adverse inference instruction:

> The Department of Corrections failed to preserve evidence regarding the surveillance footage from 7:00 PM to 7:55 PM that it was required to preserve. Because the Department of Corrections failed to preserve the evidence, and Randy Baldwin was an employee of the Department of Corrections at the time, you may, but are not required to, find that the evidence would have been unfavorable to Randy Baldwin.

The final jury instructions were delivered in the afternoon on May 13, 2025, and deliberations began thereafter. Approximately thirty (30) minutes after deliberations began, the jury returned a verdict in favor of Baldwin and against Tolbert.

A few days later, this Court granted Tolbert's request to proceed pro se and allowed Tolbert's counsel to withdraw. *See* ECF Nos. 252, 257. Tolbert's request for an extension of time to file post-trial motions was also granted. *See* ECF No. 259. On or about June 11, 2025, Tolbert filed a direct appeal to the Third Circuit Court of Appeals. *See* ECF No. 271. On June 27, 2025, Tolbert timely filed a Motion for New Trial. *See* Mot., ECF No. 276. Thereafter, the Third Circuit Court of Appeals stayed the direct appeal pending this Court's resolution of Tolbert's Motion for a New Trial. *See* ECF No. 277.[22] Baldwin has responded in opposition to

---

[21]    These witnesses, Domenique Lewis and Rubar Crawford, inmates at SCI-Phoenix on the day of the incident, were called during Tolbert's case-in-chief.

[22]    This Court therefore has jurisdiction to decide Tolbert's Motion for a New Trial despite the notice of appeal.

the Motion.  *See* Opp., ECF No. 287.  Tolbert also filed numerous miscellaneous motions post-trial, which have been resolved.  *See generally* ECF Nos. 261-303.

Tolbert's Motion for a New Trial is based on the following grounds: (1) errors during jury selection, including a Batson violation; (2) weight of the evidence; (3) fraud regarding video footage allegedly altered as to the time of the incident; and (4) prejudice from a witness testifying in prison clothes.  Baldwin responds that: (1) jury selection challenges were waived and lack merit; (2) any discrepancies in time on the video did not prejudice Tolbert; and (3) complaints about the witness's prison clothes were waived and did not cause prejudice. Construing the Motion for a New Trial liberally, this Court also considers it as a request to alter or amend judgment.

## III.    LEGAL STANDARDS

### A.    Rule 59(a), Motion for New Trial – Review of Applicable Law

Under Rule 59(a), a new trial may "be granted where there was substantial error in the admission or exclusion of evidence; . . . where the jury's verdict was inadequate or excessive; or where the verdict is against the weight of the evidence. . . . A new trial may also be granted where the evidence was legally insufficient to go to the jury."  *Snider v. Sterling Airways, Inc.*, No. 13-CV-2949, 2017 U.S. Dist. LEXIS 142799, at *5 (E.D. Pa. Aug. 29, 2017).  Although the reasons the court may grant a new trial under Rule 59 are broad, "it should do so only when 'the great weight of the evidence cuts against the verdict and . . . [ ] a miscarriage of justice would result if the verdict were to stand.'"  *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).  The "court's power to grant a new trial is [further] limited to ensure that [it] does not substitute its judgment of the facts

and the credibility of the witnesses for that of the jury." *Leonard*, 834 F.3d at 386 (internal quotations omitted).

**B.    Rule 59(e), Motion to Alter or Amend Judgment – Review of Applicable Law**

"A motion under Rule 59(e) is a device to relitigate the original issue decided by the district court, and used to allege legal error" *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003) (internal quotations omitted).  The purpose of a motion to alter or amend judgment, also called a motion for judgment notwithstanding the verdict or a motion for reconsideration, "is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *Keifer v. Reinhart Foodservices, LLC*, 563 F. App'x 112, 114-15 (3d Cir. 2014).  "Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe*, 176 F.3d at 677.  "Rule 59(e) permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127-28 (2d ed. 1995)).  "The scope of a motion brought under Rule 59(e) is extremely limited." *Amor v. Conover*, No. 5:21-cv-05574-JMG, 2023 U.S. Dist. LEXIS 145023, at *5 (E.D. Pa. Aug. 18, 2023) (internal quotation marks omitted).  "A motion to alter or amend judgment pursuant to Rule 59(e) may not be granted where to do so would undermine the jury's fact-finding role and trample on the defendant's

seventh amendment right to a jury trial." *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d

729, 742 (1st Cir. 1982).

### C.    Jury strikes

A juror may be excused from jury service under the following circumstances, which

include: (1) "by the court . . . upon a showing of undue hardship or extreme inconvenience;" (2)

"by the court on the ground that such person may be unable to render impartial jury service . . . ;"

and (3) "upon a challenge by any party for good cause shown."  28 U.S.C. § 1866(c).  In *Batson

v. Kentucky*, the Supreme Court held that "the Equal Protection Clause forbids [a] prosecutor to

challenge potential jurors solely on account of their race or on the assumption that black jurors as

a group will be unable impartially to consider the State's case against a black defendant." 476

U.S. 79, 89 (1986).  The Supreme Court extended *Batson* from the criminal context to civil trials

in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 631 (1991) and from race to gender

and ethnic origin in later cases. *See United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000)

(citing *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994); *Hernandez v. New York*, 500 U.S.

352 (1991); *Batson v. Kentucky*, 476 U.S. 79 (1986)).  *Batson* set forth a three-step inquiry:

> First, the defendant must make out a prima facie case by showing that the totality
> of the relevant facts gives rise to an inference of discriminatory purpose. Second,
> once the defendant has made out a prima facie case, the burden shifts to the [party
> that made the challenge] to explain adequately the [improper] exclusion by offering
> permissible [race, ethnic origin, or gender]-neutral justifications for the strikes.
> Third, if a []neutral explanation is tendered, the trial court must then decide whether
> the opponent of the strike has proved purposeful [improper] discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal citations and quotations omitted).

A party may waive a Batson violation if it is not timely raised.  A defendant's "failure to

object at the time the alleged error was made is in violation of the contemporaneous objection

rule." *Gov't of V.I. v. Forte*, 806 F.2d 73, 75-76 (3d Cir. 1986) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940) (holding that "counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial"). The "rule serves several important functions." *Forte*, 806 F.2d at 76. A timely objection (1) "allows the trial court and the prosecutor to reconsider and perhaps change their course of conduct while still possible;" (2) "aids review on appeal because the trial court makes a timely record of the claim while the parties' recollections are still fresh;" and (3) gives the appellate court "an accurate account of the racial composition of the jury." *Id.*

## IV. DISCUSSION

### A. There were no procedural errors or Batson violations during jury selection.

Tolbert's claim of error in the way the jury was selected, *see* Mot. 3-4, is based on a misunderstanding of the jury selection process. He asserts that Attorney Jubelirer was incorrect in believing that their peremptory challenges had to be used in the "low numbers of the venire panel (#1 - #15) before she could select from the higher number jurors." *See* Mot. 3 (citing Ex. A). Attorney Jubelirer was correct[23] because it was mathematically impossible to select a jury beyond panelist #15, *see id.* at Ex. A and Opp. 4; therefore, striking a panelist higher than #15 would be fruitless. Tolbert suggests that 28 U.S.C. § 1870 allowed the Court to give additional peremptory challenges, *see* Mot. 3, but he misunderstands the law. Section 1870 only allows a court to give more than three peremptory challenges to a side when there is more than one

---

[23]    Attorney Jubelirer correctly advised Tolbert: "There was an 8-person jury in your case. We had to start from the lower to the higher numbered jurors. . . because when we started at number 1 and struck 7 jurors (3 peremptory strikes for each side and 1 for cause), our 8-person jury was picked before we could even get to the higher numbers." Mot. at Ex. A.

plaintiff or more than one defendant.  *See* 28 U.S.C. § 1870 ("In civil cases, each party shall be entitled to three peremptory challenges. [For s]everal defendants or several plaintiffs . . . the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.").  Tolbert was the sole plaintiff, and Baldwin was the sole defendant, limiting each to only three peremptory challenges and limiting the jury from being selected from the first fifteen (15) panelists.  *See id.* and footnote 23 herein.  Tolbert's Motion for a New Trial, to the extent it is based on a challenge to the way the jury was selected, is denied.

Tolbert's claim that Baldwin violated *Batson* by striking a juror solely based on race, *see* Mot. 5-6, is also denied.  Initially, this Court finds that Tolbert waived this argument by not objecting at the time of the alleged violation, *see Forte*, 806 F.2d at 75-76, or at any time before or during trial,[24] *see Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial."). *See also Mullins v. City of Philadelphia*, Civ. A. No. 06-2186, 2007 U.S. Dist. LEXIS 16114 (E.D. Pa. Mar. 6, 2007) (denying the plaintiff's motion for new trial based on the defendant's use of a peremptory challenge to exclude the only black panelist because his failure to make a Batson objection during the jury selection process waived any objection), *aff'd*, 287 F. App'x 201 (3d

---

[24]    Tolbert now complains that Attorney Jubelirer failed to object.  *See* Mot. 6.  However, because "[t]here is no right to effective counsel in a civil case, and 'a civil litigant is bound by the action or inaction of his attorney,'" *Ford v. City of Phila.*, 335 F. App'x 229, 230 (3d Cir. 2009) (quoting *Walker v. Sun Ship, Inc.*, 684 F.2d 266, 269 (3d Cir. 1982)), he cannot blame counsel to avoid waiver.  Tolbert's attempt to avoid waiver by suggesting that he was unable to object because his vision impairment, rendering him legally blind, prevented him from knowing an all-white jury was selected, *see* Mot. 6, is also unmoving because he had the ability to consult with counsel during the jury selection process as to the race of the panelists.  Moreover, although this Court recognizes Tolbert's diagnosis as legally blind, it notes that Tolbert walked around without assistance and can see, *inter alia*, objects and colors.  His attempt to avoid waiver is therefore unpersuasive.  Regardless, he has not shown that an objection would have had any merit; therefore, he suffered no prejudice by counsel's inactions.

Cir. 2008).  To the extent Tolbert's Motion may be broadly construed as claiming that this Court

discriminated against him in striking a panelist for cause, the claim, if any, is also waived.  *See*

*Jackson v. City of Pittsburgh*, No. 07-111, 2011 U.S. Dist. LEXIS 87421, at *36-37 (W.D. Pa.

Aug. 8, 2011) (denying the motion for a new trial based on alleged discrimination during the jury

selection process because the plaintiff "did not raise any objections during voir dire or the trial

regarding the composition of the jury venire, the jury pool or the jury panel or any alleged bias

against him based on his race").

Even if the arguments were not waived, they lack merit.  Tolbert's assertions regarding

the two black panelists[25] in the top fifteen (15), panelists #4 and #11, are somewhat

contradictory.[26]  He asserts that Baldwin improperly "struck for cause the only remaining black

person in the available venire pool (#1-#15) based on race."  *See* Mot. 2 and 4.  But it is unclear

whether Tolbert is referring to panelist #4 or #11 because panelist #4 was the only one "struck

for cause" (by the Court) but because the cause strikes occurred first, the only "remaining" black

panelist was #11, who was struck based on a peremptory challenge (by Tolbert).  Liberally

construing his Motion, this Court addresses both panelists.  As to panelist #4, who was struck for

cause by the Court, Tolbert's "argument fails because the principles of *Batson* [] apply only to

peremptory strikes."  *United States v. Jones*, 332 F. App'x 767, 769 (3d Cir. 2009).  Moreover,

the Court, upon an unopposed motion from counsel, properly struck panelist #4 because when

questioned, she stated that as having been the victim of sexual assault, it was "hard to say"

---

[25]    Both Tolbert and Baldwin are also black.

[26]    The lack of clarity in the Motion may come from Tolbert's misuse of the term strike.  A
party may strike a potential juror by using a peremptory challenge and may *move* the court to
strike a potential juror for cause.  Only the court can strike a potential jury for cause.  *See* 28
U.S.C. § 1870 ("All challenges for cause or favor, whether to the array or panel or to individual
jurors, shall be determined by the court.").

whether she would be able to render a fair and impartial verdict in Tolbert's trial.[27]  *See* 28 U.S.C. § 1866(c)(2)-(3) (allowing the court to strike a potential juror "on the ground that such person may be unable to render impartial jury service" or "upon a challenge by any party for good cause shown").  *Accord United States v. Gibbs*, 125 F. Supp. 2d 700, 708-09 (E.D. Pa. 2000) (holding that a jury panelist having been "the victim of crime is not alone grounds to remove a juror . . . "[*if* the] juror is questioned regarding potential bias and the court is convinced . . . that he or she will be fair and impartial").  As to panelist #11, this panelist was struck by a peremptory challenge from Tolbert's counsel, not by Baldwin's counsel, "because of her family being in law enforcement and corrections."  Mot. at Ex. A. *See also* Mot. 4 (Tolbert concedes that he did not want to select panelist #11.).  Accordingly, there was no Batson violation or discrimination, and the Motion for a New Trial on this basis is denied.

### B.    The verdict was not against the weight of the evidence.

Liberally construed, Tolbert's Motion claims that the verdict was against the weight of evidence because Baldwin gave "prior inconsistent testimony," while Tolbert offered "evidence showing his liability," including "altered video footage, adverse inference instruction, C/OR Baldwin's DC-121, [Tolbert's] credible testimony, stipulations to [Tolbert's] injuries, and two inmate witnesses corroborating testimony in part."  Mot. 6-7.  Tolbert does not specify the alleged prior inconsistent testimony he attributes to Baldwin, although this Court has highlighted a few inconsistencies in the factual background, as well as Baldwin's explanation, if any, for the same.  Regardless, the jury was free to assess the credibility of the witnesses and was "free to discard or disbelieve whatever facts are inconsistent with its conclusion."  *Lind v. Schenley*

---

[27]    Tolbert asserts that panelist #4 could have been fair and impartial because his was a failure-to-protect case, not a sexual assault.  *See* Mot. 5.  But it was the belief and statement of panelist #4 as to whether she could be fair and impartial that is controlling.

*Indus., Inc.*, 278 F.2d 79, 89 (3d Cir. 1960) (stating "it is immaterial that the court might draw a contrary inference or feel that another conclusion is more reasona[ble]") (internal quotations omitted).  The jury was also free to "discard or disbelieve" Tolbert's testimony.  *See id.*  Aside from Tolbert's testimony contradicting Baldwin about reporting the threats, the events were largely not in dispute.  Tolbert points to the physical evidence, including video of the incident and photographs of his injuries, to stipulations regarding his injuries following the assault, and to the testimony of two inmate witnesses, but much of this evidence supported both versions of the events as both parties agreed that Tolbert was assaulted by two inmates.  Baldwin did not testify, nor did counsel suggest to the jury, that Tolbert was not assaulted and injured.  Further, Baldwin did not testify that Tolbert was not threatened prior to the assault, only that he did not know about the threats.  Tolbert's witnesses also could not testify as to whether Tolbert was threatened or as to what he told Baldwin (about the threats and/or about whether he wanted his cell unlocked or that he wanted to lock in).  The video of the incident did not include sound so it too was (would have been) unhelpful in this regard.  Nevertheless, the video, had it been preserved from an earlier time, could have corroborated the testimony of Tolbert about the other inmate speaking to him while on the phone, shown him talking to Baldwin, and established what time elapsed between the alleged threats, the conversation between Tolbert and Baldwin, and Baldwin walking to Tolbert's cell, which is what the adverse instruction allowed the jury to do.  Ultimately, however, it was a credibility judgment between whether the jury believed Tolbert's account or Baldwin's account of what was said between them.  Because the jury could have found for either party, its verdict in favor of Baldwin was not a miscarriage of justice and does not shock the conscience.  *See Williamson v. CONRAIL*, 926 F.2d 1344, 1353 (3d Cir. 1991) (holding that "new trials because the verdict is against the weight of the evidence are proper only

when the record shows that the jury's verdict resulted in a miscarriage of justice or where the

verdict, on the record, cries out to be overturned or shocks our conscience").  The Motion for a

New Trial on this ground is therefore denied.

### C.    There is no evidence that Baldwin falsified evidence or that Tolbert was prejudiced by time discrepancies in the physical evidence.

Tolbert contends that Baldwin, acting in concert with counsel and the Department of

Corrections ("DOC") to violate his due process rights, altered the time of the video to reflect a

later response time of 1955 hours,[28] but knew the assault started at 1900.  *See* Mot. 7-10 (noting

that the incident reports also list the incorrect time of 1955 hours).  Tolbert seemingly bases this

argument on the medical records, which state that the incident occurred at 1900 hours and that

Tolbert reported to medical at 1935 hours.  *See id.* and Ex. D.  Additionally, photographs of

Tolbert's injuries, which were taken by a nurse in the infirmary, are time-stamped 1948 hours.

*See id.* and Ex. E.  Tolbert argues that he was prejudiced because he relied on the time from the

video in his testimony to the jury.  *See id.*  He suggests that the jury might have found him not to

be credible due to the inconsistent time in the medical records.  *See id.*  He further asserts that

because the video showed Baldwin at Tolbert's cell at 1955 hours, it gave the impression that

Baldwin responded immediately to his claim.  *See id.*  This claim fails for four reasons.

First, there is no evidence the video was altered.  Tolbert's conclusory and unsupported

allegations of falsified evidence are insufficient to warrant a new trial.  *See Bolick v. Ne. Indus.*

*Servs. Corp.*, No. 4:14-cv-00409, 2016 U.S. Dist. LEXIS 191088, at *4 (M.D. Pa. Apr. 21, 2016)

(denying the motion for relief under Rule 59(e) because plaintiffs' arguments were "wholly

---

[28]    Because the video timestamp is in military time, this Court uses military time in this section of the Opinion.

conclusory"). Tolbert's only evidence of falsification is a time discrepancy between the video and medical evidence. However, a time discrepancy does not mean that any evidence was altered. One or both systems may have had the incorrect time. Moreover, Baldwin played no role in setting the time, taking the photographs, or maintaining the evidence.[29]

Second, it is more logical that the time on the video, not the medical records, was accurate. There was undisputed testimony from both sides that JA block had recreation time at 1900 hours, which is when the cells were unlocked. Only when the cell doors were unlocked were the inmates able to leave their cells. The other inmates were spread throughout the dayroom when the assault on Tolbert spilled out of Tolbert's cell. If the assault occurred at 1900 hours, as noted in the medical records, it is highly unlikely that dozens of inmates would have had time to spread throughout the dayroom. It is also unlikely for Tolbert to have had enough time to exit his cell, walk to the other end of the block, use the phone (where he was allegedly threatened), speak with Baldwin at the officers' desk, walk the distance of the block back to his cell, and enter his cell. Crawford testified that when Tolbert was on the phone, he had recently been on the phone but was back at his cell, confirming that additional time had passed after recreation time started. The additional time is also consistent with the testimony of Baldwin, who had completed security rounds of the entire block, including both tiers of cells, before returning to the officers' desk where he spoke with Tolbert. It is undisputed that Baldwin did not accompany Tolbert back to his cell but remained at the officers' desk. The video shows him walking to Tolbert's cell, being stopped by Clancy, and arriving at Tolbert's cell at 1955 hours. Testimony from both sides is consistent with the video time stamp.

---

[29]    *But see* ECF No. 241 (imputing control and the duty to preserve on Baldwin in the limited context of spoliation)

Third, Tolbert's allegations of prejudice are conclusory and speculative. *See Alvarado v. City of Phila.*, No. 22-3763, 2025 U.S. Dist. LEXIS 108508, at \*30-31 (E.D. Pa. June 9, 2025) (denying the motion for a new trial under Rule 59(a)(1)(A) because the moving parties referred to "prejudice in a conclusory manner without explaining how any error or admission impaired their ability to present a defense or undermined the fairness of the proceeding"). He first suggests that the jury may have found him not to be credible because his testimony as to the time of the events contradicted the medical records. However, it is unreasonable to think that the jury would base a credibility determination on an inconsistent time in the medical records because the jury saw the timestamp on the video and would have understood the reason for the inconsistency. Even if the jury noticed the time discrepancy in the medical records, the parties stipulated that Tolbert was admitted to the infirmary at 2113 hours, which would mean that the time on the photographs taken in the infirmary (1943 hours) was incorrect, not the video timestamp. It is illogical to think that the jury would hold a discrepancy in prison records against Tolbert, who had no control over the records. It is also unreasonable to think that the jury would have held the time discrepancy only against Tolbert and not Baldwin, whose testimony was similarly based on the video timestamp. Accordingly, Tolbert's claim of credibility prejudice lacks merit. His suggestion that the time on the video prejudiced him by giving the impression that Baldwin responded immediately to his complaint is also unmoving because the sequence of events (and Baldwin's alleged failure to protect) was based on the testimony of the parties and witnesses, not based on any time elapse in the video. The question of liability centered on whether Baldwin knew about a threat to Tolbert's safety, not about how quickly he reacted before the assault began. Moreover, the video did not show Tolbert on the phones when he was allegedly

threatened, for which an adverse inference instruction was given, stating that the jury could find

that the evidence would have been unfavorable to Baldwin.

Fourth, neither party or counsel mentioned the time discrepancy at any time before or

during trial.  Tolbert's suggestion that he did not discover the alleged alteration until after the

trial due to his blindness, *see* Mot. 8, does not render it new evidence for purposes of a motion to

alter or amend judgment.  *See Max's Seafood Cafe*, 176 F.3d at 677.  The video footage was

made available to Tolbert for viewing on October 24, 2022.  *See* ECF No. 83.  On January 10,

2023, Baldwin was directed to respond to Tolbert's request for his medical records and

photographs of his injuries from March 20, 2020.  *See* ECF Nos. 61, 63.  These documents were

undoubtedly produced because on June 5, 2024, Tolbert attached the same March 20 medical

records and photographs that were entered at trial to his brief in opposition to Defendants'

Motion for Summary Judgment.  *See* ECF No. 145 at Exs. F, H.  Moreover, Attorney Jubelirer,

who did not have any visual impairment, either did not notice the discrepancy or made the

strategic decision to not raise it.

The Motion for New Trial on this ground is denied.

### D.    There was no prejudice to Tolbert from his witnesses testifying before the jury in prison garb.[30]

Tolbert asserts that he was prejudiced because his inmate witness, Domenique Lewis,

was "forced" to testify in prison garb.  *See* Mot. 10-11 (citing *Harrington v. California*, 395 U.S.

250 (1969)).  His claim fails for six reasons.  First, the argument is waived because Tolbert failed

to object at the time of trial.  *See Estelle v. Williams*, 425 U.S. 501, 512-13 (1976) (holding that

"although the State cannot, consistently with the Fourteenth Amendment, compel an accused to

---

[30]    There is no suggestion, nor could there be, that Tolbert was forced to appear before the
jury in prison garb.  This claim applies only to the inmate witnesses.

stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."); *Gaito v. Brierly*, 485 F.2d 86, 88 n.3 (3d Cir. 1973) (holding that a "defendant may not remain silent and willingly go to trial in prison garb and thereafter claim error" as "[t]his would constitute a voluntary waiver" (internal quotations omitted)).[31]  Second, the witnesses were not "forced" to testify in prison garb; rather, Tolbert's counsel chose to have them testify in prison garb.  Third, Tolbert's reliance on *Harrington* is misplaced because that Court was addressing whether cumulative error could be harmless in a criminal case, not a civil case, and limited its holding to the facts of that case, which did not deal with a party or witness appearing in prison attire.  *See Harrington*, 395 U.S. at 254 ("Our decision is based on the evidence in this record.").  Fourth, any potential prejudice was reduced when this Court granted the request of Attorney Jubelirer that each inmate witness be seated at the witness stand outside the presence of the jury.  This Court excused the jury from the courtroom when each witness was taken to and from the witness stand.  Fifth, the jury was advised about the factual allegations of the case and was questioned during voir dire to eliminate jurors with potential bias against an inmate-witness.  Specifically, they were asked: "Would anyone be either more or less likely to believe someone's testimony if you knew that that person was incarcerated and/or serving a sentence for a crime?"  No one responded affirmatively to this question.  Sixth, regardless of their attire, the jury knew Lewis and Crawford were inmates because one of the first questions Attorney Jubelirer asked each was where they

---

[31]      This Court recognizes that *Estelle* and *Gaito* addressed a defendant's prison clothing, not a witness's clothing, and applied to criminal case, not civil.  However, because the rights of criminal defendants are subject to greater protections that a civil litigant, if a criminal defendant can waive the objection, it necessarily means that a civil litigant can also waive the claim.

were currently living (prison) and where they were living in March 2020 (SCI-Phoenix, housed on JA block). Both Lewis and Crawford testified about what they saw and heard at SCI-Phoenix on March 20, 2020, and identified themselves on the video from the dayroom of JA block. In *Perricone*, the Third Circuit Court of Appeals addressed the situation where a plaintiff, a prison inmate who brought a § 1983 action against prison guards, was escorted to the witness stand by a prison guard, was compelled to appear before the jury panel in prison garb, and was seen by one or more jurors in handcuffs. *See Perricone v. Clarke*, 27 F. App'x 109 (3d Cir. 2002). The court rejected the plaintiff's claim that he was denied a fair trial because "[i]t was no secret to the jurors that [he] was a Graterford inmate." *Id.* at 109. The court explained that the alleged errors "did not tell the jury anything they had not already learned from the evidence or the nature of the case." *Id.* ("There is no indication the fairness or integrity of the judicial proceeding was seriously affected."). Applying the reasoning in *Perricone*, this Court reaches the same conclusion here. For all these reasons, there was no prejudice and the claim is denied.

Having found no error in this case, this Court also rejects Tolbert's claim of cumulative effect. *See* Mot. 10.

## V.    CONCLUSION

For the reasons discussed herein, two of Tolbert's claims were waived and all four lack merit. First, Tolbert waived his Batson claim by not raising it at the time of the jury challenge. Regardless, there is no evidence of a Batson violation or of any errors during the jury selection process. Second, the verdict was not against the weight of the evidence because this was largely a he-said, he-said case and credibility determinations are reserved for the jury. Third, Tolbert has not shown that video evidence was altered or that he was prejudiced by the time discrepancy between the video and medical evidence as his testimony, as to the time of the events, was

consistent with his witnesses and with Baldwin.  Tolbert waived his fourth claim, arguing that

his inmate witnesses were forced to testify in prison garb, by not raising it at the time of trial.

This claim also lacks merits because the jury was informed of the witnesses' status as inmates, as

they testified about what they saw and heard on JA block on the day of the events.  The Motion

for a New Trial, liberally construed under both Rule 59(a) and (e) is denied.

      A separate order follows.


                  BY THE COURT:


                  */s/ Joseph F. Leeson, Jr.*
                  JOSEPH F. LEESON, JR.
                  United States District Judge